## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

FIRST MEDIA INSURANCE
SPECIALISTS, INC. et al.,

        *Plaintiffs,*

  vs.                           Case No. 10-2501-EFM

ONEBEACON INSURANCE COMPANY, a
Pennsylvania corporation, et al.,

        *Defendants.*

### MEMORANDUM AND ORDER

This case involves a dispute between Plaintiffs and Defendants over the proper calculation of profits under a contract the parties entered into on May 2, 2005. Due to this dispute, Plaintiffs bring four claims against six Defendants. These claims include breach of contract, fraud, negligent misrepresentation, and breach of fiduciary duty. Defendants now seek summary judgment on all claims (Doc. 107). Plaintiffs also seek partial summary judgment on their breach of contract claim (Doc. 104). The Court held a hearing on August 20, 2014. As to the breach of contract claim, the Court concludes that several legal issues can be resolved on the record before the Court, but several factual issues remain. Thus, the Court grants in part and denies in part Defendants' Motion for Summary Judgment and grants in part and denies in part Plaintiffs' Motion for Partial Summary Judgment. As to Plaintiffs' claims of fraud, negligent

misrepresentation, and breach of fiduciary duty, the Court finds that these claims are barred by the statute of limitations and grants Defendants' Motion for Summary Judgment on these claims.

## I.  Factual and Procedural Background[1]

### *Plaintiffs*

Plaintiff First Media Insurance Specialists, Inc. ("First Media") is a corporation organized in the state of Kansas, with a principal place of business in Overland Park, Kansas.  In 1998, Plaintiff Tracy Michelle Worrall Tilton ("Tilton") founded First Media as a managing general agent for insurance companies that marketed, underwrote, issued, and administered media liability insurance policies.  Plaintiff J. Lawrence Worrall ("Worrall") joined First Media as Chief Executive Officer in or around 2000.  At the time of the asset sale at issue, Plaintiff Tilton was the President and minority shareholder of First Media, and Worrall was the Chief Executive Officer and majority shareholder of First Media.

### *Defendants*

Defendant OneBeacon Insurance Company ("OBIC") is a Pennsylvania corporation with its principal place of business in Minnesota.  Defendant OneBeacon Professional Insurance, Inc. ("OBPI"), formerly known as OneBeacon Professional Partners, Inc. ("OBPP"), is a Delaware corporation with its principal place of business in Farmington, Connecticut.  OBIC is an insurance company that issues policies to insure a variety of risks, including media liability. OBPI underwrites and sells specialty professional liability products for OBIC.  Defendants OBIC and OBPI are affiliated companies and are collectively referred to as "OneBeacon."  There are four individual Defendants who were formerly employed by OneBeacon: Matthew Dolan, who

---

[1]    The facts that the Court sets forth are the uncontroverted facts, in accordance with summary judgment procedure.  The Court notes that it has also set forth several of the parties' disputed positions.

held the titles of Senior Vice President and President of OBPI from 2002 to 2008; Randall Oates, who was OBPI's Chief Operating Officer; Joshua Stein, who was OBPI's Chief Underwriting Officer; and Tammi Dulberger, who held the titles of Executive Vice President and Chief Actuary at OBPI.

### Background

During the summer of 2004, key executives of OBPI (acting on behalf of OBIC) contacted Worrall and Tilton to inquire whether they would be interested in selling the assets and business of First Media to OneBeacon. Defendants Dolan, Oates, Stein, and Dulberger were part of a due diligence team investigating First Media to determine whether OneBeacon was interested in purchasing First Media's assets. Plaintiffs Worrall and Tilton and OneBeacon executives had discussions and several in-person meetings about the proposed transaction.

In negotiating the written Asset Purchase Agreement ("APA"), Plaintiffs were represented by attorney Ricardo Fontg, and OneBeacon was represented by attorney Tim Curry. The APA went through several revisions between February 23, 2005 and May 2, 2005.[2] On May 2, 2005, OneBeacon and First Media entered into the written APA and related Non-Disclosure and Non-Compete Agreements (collectively "Agreements"), which transferred the assets and business of First Media to OneBeacon. Pursuant to the Agreements, the purchase price for First Media's assets includes (a) an "Asset Consideration" payment of $350,000; (b) a "Cash

---

[2] The parties disagree as to whether Fontg (representing Plaintiffs) or Curry (representing Defendants) "prepared" the APA. Plaintiffs assert that Defendants' counsel prepared the first draft of the APA. Defendants dispute this fact and contend that the executed APA states on the first page: "Prepared by: Ricardo E. Fontg," which demonstrates that Plaintiffs' counsel prepared the APA. Fontg, however, provided an affidavit in which he avers that the initial drafts of the APA were prepared by OneBeacon and that he only prepared a binder containing the signed agreements. Regardless of the parties' disagreement, Section 9(k) of the APA states: "Construction. The parties acknowledge and agree that each of them has participated in the negotiation of this Agreement and has been represented by counsel. The parties agree that any rule of law requiring construction of a document against a party by reason such party's having prepared such document shall not apply to this Agreement." APA, Section 9(k), Doc. 108-5, p. 19. Thus, the dispute over who "prepared" the APA appears irrelevant.

Advance" of $500,000; and (c) the "Profit Consideration."  In addition, as part of the APA

transaction, Tilton became an employee of OBPI, and Worrall became a consultant to OBPI.

Section 2(a)(ii) of the APA defines "Profit."

"Profit" means the excess of (A) total media liability insurance premiums written (whether or not fully earned) by Purchaser-affiliated insurance companies during the forty-two (42) month period from the Closing Date (the "Profit Sharing Period"), over (B) the sum of booked Losses, allocated loss adjustment expense ("ALAE") and general expenses during such forty-two month period, all on a GAAP basis (except as otherwise permitted by this Agreement).  General expense includes all the direct costs associated with operating the Fairway, Kansas office (including personnel, occupancy and related costs), all policy acquisition costs, insurer-paid premium taxes, provision for unallocated loss adjustment expense ("ULAE"), and an override for corporate overhead equal to one and one half percent (1.5%) of premiums (the "Corporate Overhead Charge").  The Corporate Overhead Charge is subject to increase if and to the extent that Purchaser increases the overhead for OneBeacon Professional Partners, Inc. ("OBPP") above one percent (1%), but in no event shall the Corporate Overhead Charge exceed two percent (2%).[3]

Section 2(a)(iii) defines "Profit Consideration" as "an amount equal to fifteen percent

(15%) of the Profit."[4]  Section 2(c) of the APA sets forth the "Payment of the Purchase Price" as

follows:

(i)    The sum of $850,000 (representing the Asset Consideration and the Cash Advance) will be paid at Closing (the "Closing Consideration").

(ii)   The remaining Profit Consideration shall be payable as follows: (x) within thirty (30) days after expiration of the Profit Sharing Period, Purchaser will pay 60% of the Profit Consideration (basing Profit computations on the most recent data then available), less the $500,000 Advance; (y) within thirty (30) days after the first anniversary of the expiration of the Profit Sharing Period, Purchaser will pay 100% of the Profit Consideration payments already paid, either at Closing or in the prior year; and (z) within thirty (30) days  after each of the subsequent five anniversaries of the expiration of the Profit Sharing Period, Purchaser will pay the Company

---

[3] APA, Section 2(a)(ii), Doc. 108-5, pp. 5-6.

[4] APA, Section 2(a)(iii), Doc. 108-5, p. 6.

100% of Profit Consideration (basing Profit computation on the most recent date then available), less all Profit Consideration payments already paid.[5]

In addition to paying First Media "Profit Consideration" of 15%, Tilton and Worrall entered into non-compete agreements with OBIC under which they were each entitled to an additional 5% each of the "Profit" under the APA. This sum was "to be paid at the same time(s) and in the same manner as Profit Consideration is paid to First Media under Section 2 of the Asset Purchase Agreement."[6]

The Agreements required OneBeacon to make the first Profit Consideration payment by December 2, 2008. Around March 2008, OneBeacon provided Plaintiffs with a preliminary Profit Consideration calculation, which contained an estimate of losses of approximately $18 million, which contained Incurred But Not Reported ("IBNR") loss reserves.[7] IBNR loss reserves are estimates by actuaries of losses that have been incurred but which have not yet been reported. The inclusion of IBNR loss reserves in the March 2008 calculation resulted in a loss ratio of 56.7%. At Plaintiffs' request, Fontg contacted OneBeacon's new in-house counsel,

---

[5] APA, Section 2(c)(i)-(ii), Doc. 108-5, p. 6.

[6] Worrall's Non-Disclosure and Non-Compete Agreement, Doc. 108-5, p. 46; Tilton's Non-Disclosure and Non-Compete Agreement, Doc. 108-5, p. 48.

[7] Defendants agree that they provided Plaintiffs with a preliminary Profit Consideration statement in March 2008. Defendants, however, also provided Plaintiffs with at least twenty-seven Profit Consideration statements from August 2005 to January 2009. Thus, Defendants contend that Plaintiffs were aware of its Profit Consideration calculations (and inclusion of IBNR loss reserves) as early as August 2005. The previous Profit Consideration statements and the March 2008 Profit Consideration statement are identical except for the amount. At oral argument, Plaintiffs' attorneys stated that Plaintiff Tilton had attended a meeting prior to the receipt of the March 2008 Profit Consideration statement that caused her to look at the statements in a different light.
Plaintiffs affirmatively state that in March 2008 they became aware that Defendants intended to include IBNR loss reserves as a component of "booked Losses" under the APA. And the parties actually discussed IBNR loss reserves as a component of the Profit Consideration for the first time in March 2008. Accordingly, the Court will use March 2008, for purposes of Defendants' summary judgment motion, as the time in which Plaintiffs learned of Defendants' intent to use IBNR loss reserves as a component of "booked Losses" under the APA.

Nicholas Maglio, and contested OneBeacon's calculation of the aggregate Profit Consideration due under the Agreements. OneBeacon, through its counsel, contended that "booked Losses" under the APA included IBNR loss reserves. After March 2008, the parties continued to discuss their differences about the meaning of "booked Losses" under the APA.

In mid-November 2008, OneBeacon provided Plaintiffs with OneBeacon's "October 2008 Profit Share Calculation," which purported to calculate the amount due to Plaintiffs under the first post-closing aggregate Profit Consideration payments required by the Agreements. OneBeacon also issued several checks to First Media and to Worrall on November 21, 2008, based on OneBeacon's calculation of the Profit Consideration.[8]  These checks were not cashed as the parties disputed the appropriateness of the amount. Over the next twenty-two months, the parties continued to disagree over the amount due to Plaintiffs.[9]

Plaintiffs filed this lawsuit on September 16, 2010, asserting numerous claims against Defendants. At the current time, there are only four relevant claims pending: (1) breach of contract, (2) fraud, (3) negligent misrepresentation, and (4) breach of fiduciary duty.[10] Defendants now seek summary judgment on all claims (Doc. 107). Plaintiffs also seek partial summary judgment on their breach of contract claim (Doc. 104). Plaintiffs seek summary judgment as to liability but request a trial as to damages on this claim.

---

[8] Plaintiff Tilton's check was apparently going to be issued through OneBeacon's payroll system.

[9] By December 2, 2009, pursuant to Section 2(c)(ii) of the APA, OneBeacon was required to pay 100% of the Profit Consideration, based on the most recent data available, less all previous Profit Consideration payments already paid. OneBeacon issued checks to Plaintiffs again in late December 2009 for the purported amount due under the APA based on OneBeacon's calculation of the Profit Consideration. By December 2, 2010, and December 2, 2011, Defendant was required to make two additional Profit Consideration payments. OneBeacon calculated the Profit Consideration and issued payment in late December 2010 and December 2011. These checks also were not cashed.

[10] *See* Pretrial Order, Doc. 103, pp. 23-24. The breach of contract claim is only brought against the corporate entities—not the individual Defendants.

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[11] The movant bears the initial burden of proof, and must show the lack of evidence on an essential element of the claim.[12]  The nonmovant must then bring forth specific facts showing a genuine issue for trial.[13]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[14]  The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[15]

Though the parties in this case filed cross-motions for summary judgment, the legal standard remains the same.[16]  Each party retains the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law.[17]  "When the parties file cross motions for summary judgment, [the court is] entitled to assume that no evidence needs to

---

[11]  Fed. R. Civ. P. 56(a).

[12]  *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[13]  *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[14]  *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[15]  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[16]  *City of Shawnee v. Argonaut Ins. Co.*, 546  F. Supp. 2d 1163, 1172 (D. Kan. 2008).

[17]  *United Wats, Inc. v. Cincinnati Ins. Co*., 971 F. Supp. 1375, 1381-82 (D. Kan. 1997) (citing *Houghton v. Foremost Fin. Servs. Corp.*, 724 F.2d 112, 114 (10th Cir. 1983)).

be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[18]

### III.    Analysis

**A.  Breach of Contract**

Both parties seek summary judgment on Plaintiffs' breach of contract claim.  Plaintiffs seek partial summary judgment (on four separate issues) and request the Court to rule in their favor as to liability and to conduct a trial as to damages.  Defendants seek summary judgment in their favor on the entirety of the claim.

**1.   Defendants' Motion for Summary Judgment (Doc. 107 )**

***a.   Statute of Limitations***

The parties agree, and the contract provides, that the agreement is governed by Kansas law.  The Court must first address Defendants' argument that Plaintiffs' breach of contract claim is barred by the statute of limitations.  K.S.A. § 60-511(1) provides that "[a]n action upon any agreement, contract or promise in writing" must be brought within five years.  Defendants contend that Plaintiffs' cause of action accrued in August 2005 even though Defendants did not owe any payment to Plaintiffs under the APA until December 2, 2008.  Defendants make this assertion by claiming that Defendants gave Plaintiff Tilton the first of at least twenty-seven Profit Consideration statements on August 12, 2005.  Defendants claim that these Profit Consideration statements alerted Plaintiffs to the fact that Defendants were including IBNR loss reserves in their Profit Share calculations.  Because Plaintiffs brought this action in September

---

[18] *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

2010, more than five years after Plaintiff Tilton's receipt of the Profit Consideration statement in August 2005, Defendants contend that Plaintiffs' breach of contract is untimely.

The Court disagrees.  In this case, the contract was not breached until Defendants failed to make the payment due under the APA.[19]  "A cause of action for breach of contract accrues when a contract is breached by the failure to do the thing agreed to, irrespective of any knowledge on the part of the plaintiff or of any actual injury it causes."[20]  Defendants were required to make the first Profit Consideration payment "within thirty (30) days after the first anniversary of the expiration of the Profit Sharing Period."[21]  The expiration of the Profit Sharing Period was November 2, 2008, and thirty days later was December 2, 2008.  Defendants, based on their calculation of the Profit Consideration, made the first offer of the Profit Consideration payment on November 21, 2008.  Thus, Plaintiffs' breach of contract action did not accrue until that date, and Plaintiffs' breach of contract cause of action is timely.

### b.  *"Booked Losses" Contractual Provision*

Moving on to the substantive issue, under Kansas law, the construction of a written contract is a question of law for the Court.[22]  "The primary rule for interpreting written contracts is to ascertain the parties' intent.  If the terms of the contract are clear, the intent of the parties is to be determined from the contract language without applying rules of construction."[23]  If a

---

[19] Even if Plaintiffs knew as early as August of 2005, or as late as March of 2008, that Defendants intended to include IBNR in the Profit Consideration calculations, their knowledge is irrelevant until Defendants actually breached the contract.

[20] *Pizel v. Zuspann*, 247 Kan. 54, 74, 795 P.2d 42, 54 (1990).

[21] APA, Section 2(c)(i)-(ii), Doc. 105-26, p. 6.

[22] *Wagnon v. Slawson Exploration Co., Inc.*, 255 Kan. 500, 511, 874 P.2d 659, 666 (1994).

[23] *Carrothers Constr. Co. v. City of S. Hutchinson*, 288 Kan. 743, 751, 207 P.3d 231, 239 (2009).

contract is unambiguous, the Court must enforce that contract and may not rewrite it.[24]  Whether a contract is ambiguous is also a question of law for the Court.[25]  "[T]he parties' agreement or lack of agreement on the existence of ambiguity does not compel the court to arrive at the same conclusion."[26]  "Ambiguity in a contract does not appear until two or more meanings can be construed from the contract provisions."[27]  Even though the parties may not agree as to the meaning of the terms, this dispute does not, by itself, demonstrate that the contract terms are ambiguous.[28]  If, however, the Court determines that the contract language is ambiguous, undisputed "extrinsic or parol evidence may be considered to construe it."[29]  If the extrinsic or parol evidence is disputed, summary judgment is inappropriate.[30]

### 1. IBNR (Incurred But Not Reported) Loss Reserves

Plaintiffs' main contention as to how Defendants allegedly breached the contract is that Defendants improperly reduced Plaintiffs' Profit Consideration by including IBNR loss reserves as a component of "booked Losses."   Defendants assert that "booked Losses" includes IBNR loss reserves while Plaintiffs contend that "booked Losses" do not.  The contractual provision in dispute states:

"Profit" means the excess of (A) total media liability insurance premiums written (whether or not fully earned) by Purchaser-affiliated insurance companies during the forty-two (42) month period from the Closing Date (the "Profit Sharing

---

[24] *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 713, 732 P.2d 741, 746 (1987).

[25] *Simon v. Nat'l Farmers Org., Inc.*, 250 Kan. 676, 680, 829 P.2d 884, 888 (1992).

[26] *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 964, 298 P.3d 250, 265 (2013).

[27] *Carrothers*, 288 Kan. at 751, 207 P.2d at 239.

[28] *Stouder v. M & A Tech., Inc.*, 2012 WL 28066, at *7 (D. Kan. Jan. 5, 2012) (citation omitted).

[29] *Waste Connections*, 296 Kan. at 963, 298 P.3d at 264.

[30] *Id.* at 964, 298 P.3d at 265.

Period"), over (B) the sum of booked Losses, allocated loss adjustment expense ("ALAE") and general expenses during such forty-two month period, all on a GAAP basis (except as otherwise permitted by this Agreement). General expense includes all the direct costs associated with operating the Fairway, Kansas office (including personnel, occupancy and related costs), all policy acquisition costs, insurer-paid premium taxes, provision for unallocated loss adjustment expense ("ULAE"), and an override for corporate overhead equal to one and one half percent (1.5%) of premiums (the "Corporate Overhead Charge").[31]

As noted above, the pertinent question is whether "booked Losses" includes IBNR loss reserves. It is undisputed that the APA does not contain the term "Incurred but Not Reported" nor the term "IBNR" loss reserves. IBNR loss reserves are not referenced in the Agreements. The contract also does not specifically define the term "booked Losses." Thus, the Court must determine whether "booked Losses" is an ambiguous term in relation to the paragraph and contract as a whole.

Defendants offer a valid argument that the term "booked Losses," as used in the contract, is subject to an important modifying phrase—"all on a GAAP basis." Plaintiffs disagree that "all on a GAAP basis" applies to booked Losses and contend that "all on a GAAP basis" only applies to the immediately-adjacent term "general expenses during such forty-two month period." Plaintiffs rely upon a grammatical principle called the "last antecedent rule." "The last antecedent rule says qualifying words are ordinarily confined to the last antecedent, or to the words and phrases immediately preceding."[32] "The rule of the last antecedent, however, 'is not an absolute and can assuredly be overcome by other indicia of meaning.'"[33] And as the Tenth

---

[31] APA, Section 2(a)(ii), Doc. 108-5, p. 5.

[32] *Link, Inc. v. City of Hays*, 266 Kan. 648, 654, 972 P.2d 753, 757 (1999) (quotation marks and citation omitted).

[33] *United States v. Hayes*, 555 U.S. 415, 425 (2009) (citing *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)); *see also Payless Shoesource, Inc. v. Travelers Cos., Inc.*, 585 F.3d 1366, 1371 (10th Cir. 2009) (citing *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 355 (2005)). "[T]he last antecedent rule is flexible," and it

Circuit has noted, "while the rules of English grammar often afford a valuable starting point to understanding a speaker's meaning, they are violated so often by so many of us that they can hardly be safely relied upon as the end point of any analysis of the parties' plain meaning."[34] Furthermore, another rule of construction is the "rule of punctuation."[35] "One of the methods by which a writer indicates whether a modifier that follows a list of nouns or phrases is intended to modify the entire list, or only the immediate antecedent, is by punctuation—specifically by whether the list is separate from the subsequent modifier by a comma."[36] When there is not a comma, the modifier generally only applies to the last antecedent.[37] When there is a comma, the modifier generally applies to the entire list.[38]

As noted above, to determine whether "booked Losses" is an ambiguous term, the Court must look at the term in relation to the sentence and paragraph as a whole.   Plaintiffs' interpretation that "all on a GAAP basis" only modifies "general expenses during such forty-two month period" is implausible.   The comma behind the modifying phrase "all on GAAP basis" indicates that "all on a GAAP basis" modifies the entire preceding list.   Furthermore, if the Court only applied "all on a GAAP basis" to general expenses (the last antecedent), the word "all" would be rendered meaningless.   Thus, the phrase "all on a GAAP basis" modifies *all* of the

---

should not be applied if it would change the plain intent of the language or result in an absurdity.  *Link*, 266 Kan. at 654, 972 P.2d at 758.

[34] *Payless Shoesource*, 585 F.3d at 1372.

[35] *See Bingham, Ltd. v. United States*, 724 F.2d 921, 926 n. 3 (11th Cir. 1984) ("Where the modifier is set off from two or more antecedents by a comma, the supplementary 'rule of punctuation' states that the comma indicates the drafter's intent that the modifier relate to more than the last antecedent."); *see also United States v. Telluride, Colo.*, 146 F.3d 1241, 1245 (10th Cir. 1998) (citing *Bingham*, 724 F.2d at 926 n. 3)).

[36] *Am. Int'l Group, Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 781-82 (2d Cir. 2013).

[37] *Id*. at 782.

[38] *Id.*

preceding antecedents—"the sum of booked Losses, allocated loss adjustment expense ("ALAE") and general expenses during such forty-two month period."

Now that the Court finds that "all on a GAAP basis" modifies the term "booked Losses," the Court must consider how GAAP principles relate to "booked Losses" and whether IBNR loss reserves are considered booked Losses. Defendants provide evidence that insurance company losses stated on a GAAP basis include various items, including IBNR loss reserves and other reserves. In addition, Defendants provide evidence that if an insurance company fails to record IBNR loss reserves as losses on its books, then that company's books are not in conformity with GAAP. Finally, there is evidence that insurance companies must reflect IBNR reserves on their books so that their financial reporting is accurate; otherwise, an insurance company's income would be overstated if IBNR loss reserves were not included on its books.

With regard to these three facts, Plaintiffs object to them as being immaterial or object that they are inadmissible extrinsic, parol evidence. First, these facts are material to the interpretation of this contract because the contract requires "booked Losses" to be considered on a GAAP basis, so the Court must look to GAAP in determining what "booked Losses" encompasses. Second, this evidence is not extrinsic, and Plaintiffs do not dispute the validity of the evidence.[39] The parties agree that GAAP requires INBR loss reserves to be accounted for on an insurance company's books. And the Court finds that the contract unambiguously requires booked Losses to be considered on a GAAP basis. Thus, the Court must look to GAAP principles in defining booked Losses.

---

[39] At oral argument, Plaintiffs again agreed that GAAP requires the inclusion of IBNR loss reserves but again argued that looking at the application of GAAP was extrinsic evidence.

In this case, it is undisputed that GAAP principles provide that an insurance company must record IBNR loss reserves as losses on its books.  Accordingly, "booked Losses . . . on a GAAP basis" must include IBNR loss reserves.  Thus, IBNR (as a component of booked Losses) must be included in the Profit Consideration calculation, and Defendants did not breach the contract when it included IBNR as a component of booked Losses.  Accordingly, the Court grants Defendants summary judgment on this point.

## 2.  *Forty-two-month period*

Defendants next contend that "booked Losses" include losses that develop after the forty-two-month period.  Plaintiffs disagree.  The APA provides for Defendants making Profit Consideration payments in seven annual installments.  The first payment was due by December 2, 2008.  The remaining six annual installments were to be made around the same time each year, with the last one occurring by December 2, 2014.  The APA requires that the annual payments be determined "on the most recent data then available."[40]  This language requires a computation of the Profit Consideration, on an annual basis for seven years, based on the most recent data.  In looking at this language, in conjunction with the seven-year payment period for the Profit Consideration, the APA requires that booked Losses developing throughout the payout period be accounted for in the profit computation.  If the Profit Consideration were only calculated on information available at the date of the forty-two month period, this provision for seven years of adjusted calculations would be meaningless.  Accordingly, the Court grants Defendants summary judgment on this issue.

---

[40] APA, Section 2(c)(ii), Doc. 108-5, p. 6.

In sum, the Court grants Defendants' Motion for Summary Judgment on these two issues. The Court, however, does not grant Defendants' motion in full because the evidence demonstrates that Defendants breached the contract in other ways, as explained below.

### 2. Plaintiffs' Motion for Summary Judgment (Doc. 104)

In addition to seeking summary judgment on the basis that Defendants impermissibly reduced Plaintiffs' profit consideration by including IBNR as a component of booked Losses,[41] Plaintiffs seek summary judgment on three other bases for breach of contract. Plaintiffs contend that Defendants breached the contract by (1) using an incorrect premium amount in its 2008 and 2009 Profit Consideration calculations and including improper expenses as losses, (2) failing to tender non-conditional payments to Plaintiffs in 2008 through 2013, and (3) failing to provide or perform timely profit consideration calculations in 2009 through 2013.

With regard to these three contentions, Defendants first argue that Plaintiffs failed to assert these theories in the Amended Complaint and Pretrial Order and are therefore precluded from bringing these claims now. The Court, however, finds contrary to Defendants' contention and determines that Plaintiffs referenced these theories in the Pretrial Order.[42] Accordingly, the Court concludes that Plaintiffs can assert these theories.

### a. *Incorrect Premium Numbers and Improper Expenses*

Plaintiffs contend that Defendants breached the contract by using an incorrect, lower number for gross written premium and included impermissible expense deductions. With regard

---

[41] As noted above with regard to Defendants' Motion for Summary Judgment, the Court disagrees with Plaintiffs' reading of the contract. The Court finds that Defendants did not breach the contract by including IBNR loss reserves as a component of booked Losses. Thus, the Court denies Plaintiffs' request for summary judgment on this point.

[42] *See* Pretrial Order, Doc. 103, p. 11.

to the first point, Defendants failed to include two days' worth of premium in its 2008 and 2009 Profit Consideration calculations.  Defendants state that they do not concede that they made an error.  But they also state that they cured the alleged error in 2010 when Defendants updated its profit calculations to include these two days' worth of premiums, and in any event, this alleged breach is immaterial and insubstantial.  Defendant's implicit concession that they failed to appropriately calculate the premiums in 2008 and 2009 is indicative of a breach of contract for the use of improper premium numbers.  Accordingly, Plaintiffs are entitled to summary judgment on this point.

As to Plaintiffs' second contention, Plaintiffs assert that Defendants improperly included as general expenses (1) an employee sign-on bonus and employee benefits as part of general expenses; (2) consulting fees, and (3) data mega charges.  Plaintiffs also contend that Defendants improperly included ULAE reserves as part of ULAE expenses.    With regard to these issues, the Court concludes that there are genuine issues of material fact as to the whether these items were improperly included or not.  Because the Court cannot resolve these questions of fact on the record before the Court, Plaintiffs are not entitled to summary judgment on these issues.

b.  ***Failure to Tender Non-conditional Payments***

Plaintiffs next assert that Defendants breached the contract by failing to tender non-conditional payments in 2008 and 2009.  Defendants attempt to argue that their offers were not conditional.[43]   Yet, the evidence demonstrates that Defendants' offers of payment to Plaintiffs might have resulted in Defendants asserting an accord and satisfaction defense had Plaintiffs cashed the checks.  Defendants repeatedly indicated that they were not willing to give up any of

---

[43] Defendants argued this point in their briefs, at oral argument, and submitted additional information after the conclusion of oral argument.

their rights if Plaintiffs cashed the checks.  Thus, Plaintiffs may have forfeited their rights to their claim had they cashed the checks.  Accordingly, the record demonstrates that Defendants failed to offer non-conditional payments, and the Court grants Plaintiffs' summary judgment on this point.

> c.   ***Failure to Provide or Perform Timely Profit Consideration Calculations in 2009, 2010, 2011, 2012, and 2013***

Finally, Plaintiffs assert that Defendants breached the contract by failing to provide timely Profit Consideration statements in 2009, 2010, and 2011, and Defendants failed to provide or perform Profit Consideration calculations for 2012 and 2013.  The Court agrees.  The evidence shows that although Defendants provided Plaintiffs with Profit Consideration calculations in 2009 through 2011, these Profit Consideration calculations were not performed until late December—past the time for which the Profit Consideration calculations and payment to Plaintiffs were required to be made by the contract.[44]  In 2012 and 2013, Defendants failed to perform or calculate the Profit Consideration at all.  Thus, Plaintiffs are entitled to summary judgment on this issue.

### 3.   Summary

In sum, the Court grants Defendants' Motion for Summary Judgment on the basis that "booked Losses" include IBNR loss reserves and losses developing throughout the payout period are included under the contract.  The Court denies Defendants' Motion for Summary Judgment on the breach of contract claim because it finds that Defendants breached the contract.  The Court denies Plaintiffs' motion for summary judgment as to the exclusion of IBNR loss reserves

---

[44] The contract required a Profit Consideration payment to be made by December 2nd each year.  In 2009, Defendants provided their calculation and tendered a check on December 23, 2009.  In 2010, the date was December 29, 2010.  In 2011, Defendants provided their calculation and tendered a check on December 30, 2011.

from booked Losses.  The Court grants Plaintiffs' motion for summary judgment on the basis that Defendants breached the contract by failing to offer non-conditional payment, by improperly calculating premium numbers in 2009 and 2010, and by failing to provide or perform timely Profit Consideration calculations in 2009 through 2013.  The Court finds that there are issues of fact with regard to whether Defendants improperly included certain charges under general expenses and ULAE reserves.  There are also questions of fact as to the amount due and owing under the contract.  Because genuine issues of fact remain as to several items, and in particular as to damages, the Court will schedule a trial on these issues.

## B.  Fraud

Defendants also seek summary judgment on Plaintiffs' claim for fraud (fraudulent concealment).  Plaintiffs assert that Defendants committed fraud by failing to disclose to them that IBNR loss reserves would be included in the Profit Consideration calculations (the purchase prices of First Media).[45]  Defendants argue that Plaintiffs' claim is barred by Kansas's two-year statute of limitations.  K.S.A. § 60-513(a)(3) requires fraud actions to be brought within two years of the discovery of the fraud.  Causes of action, and the two-year statute of limitations under K.S.A. § 60-513(a), however, do not accrue until "the act giving rise to the cause of action first causes substantial injury, or, if the fact of the injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of the injury becomes reasonably ascertainable to the injured party . . . ."[46]

---

[45] Plaintiffs pursue this claim in the alternative to their breach of contract claim.

[46] K.S.A. § 60-513(b).  *See also Hutton v. Deutsche Bank AG*, 541 F. Supp. 2d 1166, 1169 (D. Kan. 2008) (noting that the statute of limitations under K.S.A. § 60-513(b) begins running "either when the alleged tortious conduct has first caused substantial injury or at the point when the plaintiff knew or reasonabl[y] should have ascertained that the alleged tortious conduct caused plaintiff to be injured.").

Defendants contend that Plaintiffs learned of the alleged fraud in August 2005, when Defendants provided Plaintiff Tilton with the first of approximately twenty-seven Profit Consideration statements. Defendants claim that these Profit Consideration statements alerted Plaintiffs to the fact that Defendants were including IBNR loss reserves in their calculations. Although there does not appear to be a difference between the previous Profit Consideration statements (August 2005 through February 2008) and the March 2008 Profit Consideration statement, Plaintiffs affirmatively state that they did not know that Defendants intended to include IBNR loss reserves as a component of "booked Losses" until March of 2008. Thus, there appears to be a question of fact as to whether Plaintiffs were aware, or should have been aware, in August 2005 that Defendants included IBNR loss reserves under "booked Losses" under the APA.

Defendants, however, alternatively assert that Plaintiffs learned of the alleged fraud in March 2008, and the statute of limitations began running at that time. Plaintiffs disagree and claim that Defendants' intention to use IBNR loss reserves in the Profit Share calculations was not ascertainable by Plaintiffs until at least November or December 2008 (when Defendants offered Plaintiffs their first Profit Consideration payment). Plaintiffs' contention, however, is belied by the record. The uncontroverted facts demonstrate that around March 2008, Plaintiffs requested that their counsel contact Defendants' counsel to contest Defendants' March 2008 Profit Consideration calculation, which included IBNR loss reserves. In Plaintiff Tilton's affidavit, she avers that as part of the March 2008 discussion between the two parties, Defendants confirmed that it had included IBNR estimates as part of its Profit Consideration

calculation.[47]   Tilton claims that Plaintiffs then immediately objected to the inclusion of IBNR

loss reserves.  Thus, Plaintiffs' fact of the injury (Defendants' inclusion of IBNR loss reserves in

the Profit Consideration calculations) became reasonably ascertainable to Plaintiffs in March

2008.  Because Plaintiffs brought this suit in September 2010, the two-year statute of limitations

for fraud claims had already expired in March 2010.   Accordingly, Plaintiffs' fraud claim is

untimely, and the Court grants Defendants summary judgment on this claim.

### C.  Negligent Misrepresentation and Breach of Fiduciary Duty Claims

Defendants also seek summary judgment on Plaintiffs' negligent misrepresentation and

breach of fiduciary duty claims.  Plaintiffs assert a claim for negligent misrepresentation based

on the same allegations as the fraud claim—Defendants failed to disclose to them that IBNR loss

reserves would be included in the Profit Share calculations.  Plaintiffs' breach of fiduciary duty

claim is also based on the same factual circumstances.   Plaintiffs contend that Defendants

breached their fiduciary duty because Defendants had superior knowledge that they intended to

use IBNR loss reserves to calculate profit and failed to inform Plaintiffs that Defendants intended

to calculate the Profit Consideration by including IBNR loss reserves.  But Plaintiffs' negligent

misrepresentation claim and breach of fiduciary duty claims are also subject to a two-year statute

of limitations period.[48]   And Plaintiffs' fact of the injury (Defendants' inclusion of IBNR loss

reserves in the Profit Consideration calculations) became reasonably ascertainable to Plaintiffs in

---

[47] Plaintiff Tilton's Affidavit,  Doc. 105-1, ¶¶10-13, p. 3.

[48] *See* K.S.A. § 60-513(a)(4) (stating that "an action for injury to the rights of another, not arising on contract" shall be brought within two years).  *See also* K.S.A. § 60-513(b) (stating that "the causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party . . . .").

March 2008.  Thus, Plaintiffs' negligent misrepresentation and breach of fiduciary duty claims are untimely as well.  Accordingly, the Court grants Defendants' Motion for Summary Judgment at to these three claims.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (Doc. 104) is hereby **DENIED IN PART and GRANTED IN PART**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 107) is **DENIED IN PART AND GRANTED IN PART**.

**IT IS SO ORDERED**.

Dated this 29th day of August, 2014.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE