## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

FIRST MEDIA INSURANCE
SPECIALISTS, INC., *et al.*,

        *Plaintiffs,*

vs.

ONEBEACON INSURANCE COMPANY,
*et al.*,

        *Defendants.*

Case No. 10-2501-EFM

## MEMORANDUM AND ORDER

The success of First Media, a company owned and operated by Tracy Michelle Worrall Tilton and her father Lawrence Worrall, lead OneBeacon and its affiliate to acquire First Media and hire the services of Tilton and Worrall. The agreement was documented by an Asset Purchase Agreement and related agreements including non-compete agreements, and involved among other payments a multi-year profit sharing agreement allowing for additional sums to the sellers (Plaintiffs). Attempted implementation of the profit sharing formula revealed that the parties had widely varying interpretations of its terms. Negotiations gave way to refusals to accept payments, then refusal to tender them, and inevitably litigation.

The Plaintiffs filed a breach of contract action along with clams for fraud, negligent misrepresentation, and breach of fiduciary duty, as well as other claims later dropped voluntarily. In response to dispositive motions, the Court granted Defendants (buyers) judgment on the remaining non-breach of contract claims, finding them barred by the statute of limitations. With respect to the breach of contract claims, the Court granted Plaintiffs judgment on its claims regarding the use of incorrect premium amounts used to calculate the first two years' profit sharing payments and the failure of Defendants to tender non-conditional payments to Plaintiffs or even, in the later years, to make the profit sharing calculations. However, the Court ruled in Defendants' favor regarding the inclusion of deductions for losses for Incurred But Not Reported (IBNR) reserves in making the profit sharing calculations.

The parties agreed that, following those rulings, the issues remaining for trial were whether certain sign-on bonuses and certain Unallocated Loss Adjustment Expenses (ULAE) were properly deductible in making the profit sharing calculations. Even after these final profit sharing issues were resolved, however, the parties also differed on whether Plaintiffs were entitled to interest on delayed payments; and if so the amount of such interest.

The parties tried the case to the bench. The Court now issues its Findings of Fact and Conclusions of Law on the issues tried.

## I.      Findings of Fact

### *The Parties*

1.    Plaintiff First Media Insurance Specialists, Inc. ("First Media") was a managing general agency that underwrote media liability insurance policies and administered claims on those policies.

2.    Plaintiff Tracy Michelle Worrall Tilton ("Tilton") founded First Media in 1998 and was an

owner until the sale of First Media's assets to OneBeacon in May 2005.  At First Media, she drafted media liability insurance policies, administered claims, hired staff, and managed vendor and carrier relationships in addition to other administrative duties.  After First Media's sale to OneBeacon, Ms. Tilton became an employee of OneBeacon until OneBeacon terminated her employment in 2010.

3.   Plaintiff J. Lawrence Worrall, Jr. ("Worrall") assumed an ownership interest in First Media approximately three years after its founding and continued an ownership interest until First Media's assets were sold to OneBeacon.  After the sale to OneBeacon, Worrall worked for OneBeacon as a consultant until OneBeacon terminated his work in 2010.

4.   Defendant OBIC is an insurance company that issues polices to insure a variety of risks, including media liability.

5.   Defendant OBPI, an OBIC affiliate, sells specialty insurance products.

***The Agreements***

6.   On or about May 2, 2005, Plaintiffs and OneBeacon entered into an Asset Purchase Agreement ("APA") that provided for the sale of the assets and business of First Media by Worrall and Tilton to OBIC.  The May 2, 2005 agreement, among other things, contained: (a) an executed Asset Purchase Agreement (the "APA") and (b) related Non-Disclosure and Non-Compete Agreements with Worrall and Tilton (the "Non-Compete Agreements," collectively with the APA, the "Agreements").

7.   Under the Agreements, the parties agreed that, among other consideration, OneBeacon would pay Plaintiffs, collectively, a 25% share of the "Profit" (the "Profit Consideration") earned on future media liability insurance policies to be written by OBIC between May of 2005 and November of 2008 (the "42-month period")—15% to First Media under the APA,

and 5% each to Worrall and Tilton as consideration under the Non-Compete Agreements.

8.    The APA defines "Profit" for these payments in relevant part as follows:

> "Profit" means the excess of (A) total media liability insurance premiums written (whether or not fully earned) by Purchaser-affiliated insurance companies during the forty-two (42) month period from the Closing Date (the "Profit Sharing Period"), over (B) the sum of booked Losses, allocated loss adjustment expense ("ALAE") and general expenses during such forty-two month period, all on a GAAP basis (except as otherwise expressly permitted by this Agreement). General expense includes all the direct costs associated with operating the Fairway, Kansas office (including personnel, occupancy and related costs), all policy acquisition costs, insurer-paid premium taxes, provision for unallocated loss adjustment expense ("ULAE"), and an override for corporate overhead equal to one and one half percent (1.5%) of premiums (the "Corporate Overhead Charge").[1]

9.    Pursuant to the APA, OneBeacon paid Plaintiffs $850,000 at closing, including $500,000 as an advance on Profit Consideration.

10.    The remaining Profit Consideration payments were to be made in annual installments, based on the most recent data available, beginning in December 2008 and continuing annually for six years thereafter.

11.    The APA sets forth the following payment schedule for when Profit Consideration payments were to be made:

> The remaining Profit Consideration shall be payable as follows: (x) within thirty (30) days after expiration of the Profit Sharing Period, [OneBeacon] will pay 60% of the Profit Consideration (basing Profit computations on the most recent data then available), less the $500,000 Advance; (y) within thirty (30) days after the first anniversary of the expiration of the Profit Sharing Period, [OneBeacon] will pay 100% of the Profit Consideration (again basing Profit computation on the most recent data then available), less all Profit Consideration payments already paid, either at Closing or in the prior year; and (z) within thirty (30) days after each of the subsequent five anniversaries of the expiration of the Profit Sharing Period, [OneBeacon] will pay [First Media] 100% of Profit Consideration (basing

---

[1] Pls.' Ex. 1, at § 2(a)(ii).

Profit computation on the most recent data then available), less all Profit Consideration payments already paid.[2]

12. Under the Agreements, the first Profit Consideration calculations and any resulting payments were due to Plaintiffs by December 2, 2008.

13. The December 2, 2008 Profit Consideration payments were to be for 60% of Plaintiffs' portion of the total "Profit," as defined in the APA, minus the Cash Advance.

14. The next Profit Consideration calculations and any resulting payments were due to Plaintiffs by December 2, 2009.  The 2009 payments were to reflect 100% of Plaintiffs' share of the "Profit" minus all amounts previously paid for Profit Consideration and the Cash Advance.

15. On each of the five anniversaries following the December 2, 2009 payment, OneBeacon was required again to calculate the "Profit," and if that calculation resulted in an increase in "Profit," OneBeacon was to pay the amount of any such increase to Plaintiffs.

*The 2008 Profit Consideration Payment*

16. Before Plaintiffs' first Profit Consideration payment became due, the parties, through legal counsel, debated the proper method for calculating Plaintiffs' payments.  Plaintiffs contacted OneBeacon to express concern that OneBeacon's 2008 Profit Consideration calculation contained inaccurate and unauthorized figures.

17. Plaintiffs challenged that OneBeacon used an incorrect gross written premium amount of $40,614,244.  This figure undervalued by $801,266 the amount of premium attributable to policies written during the 42-month period.

18. Among other items,[3] Plaintiffs also objected to OneBeacon's inclusion of a separate line-item deduction for "Net ULAE Reserve Increase" in the amount of $379,985.

---

[2] Pls.' Ex. 1, at § 2(c)(ii).

19. ULAE, or "unallocated loss adjustment expense," accounts for any expense related to the in-house costs of handling claims but that cannot be associated with a particular claim. ULAE, for example, includes the costs (salaries, benefits, and travel expenses) of operating a claims department.

20. ULAE expenses are further partitioned into one of two categories, ULAE Incurred or ULAE Reserve. ULAE Incurred includes amounts that relate to the current expenses of the claims department. ULAE Reserve records amounts established for the future payment of claims department expenses.

21. The APA's Profit formula expressly authorizes OneBeacon to include in the Profit calculation "provision for unallocated loss adjustment expense ('ULAE')" as an item of "general expenses." The APA does not mention ULAE Reserves.

22. The APA Profit formula also directs that "general expenses" be considered on a GAAP basis.

23. Generally accepted accounting principles ("GAAP") require that both ULAE Incurred and Reserve be recorded.

24. The "Net ULAE Reserve Increase" included in OneBeacon's 2008 "Profit" calculation thus signifies amounts set aside by OneBeacon for the estimated future claims-handling costs of either known or unknown claims arising from policies written during the 42-month period but that would be handled after the end of the 42-month period.

---

[3] OneBeacon's 2008 (and subsequent) Profit Consideration calculation(s) also included Incurred But Not Reported ("IBNR") loss reserves as "booked Losses" and employee sign-on bonuses, employee fringe benefits, consulting fees, and data mega charges as "general expenses," all under APA Section 2(a)(ii). Plaintiffs opposed the inclusion of these items as inconsistent with the parties' Agreements. The Court granted OneBeacon summary judgment on Plaintiffs' claim that OneBeacon breached the APA by including IBNR loss reserves. Thereafter, Plaintiffs voluntarily dropped their breach of contract claims concerning inclusion of the employee fringe benefits, consulting fees, and data mega charges. Finally, at trial, the Court granted OneBeacon's motion for judgment as a matter of law to dismiss Plaintiffs' breach of contract claim concerning OneBeacon's inclusion of sign-on bonuses. Thus, the inclusion of these items is no longer at issue.

25.   The parties also engaged in discussions through their counsel about how to handle payment in light of the parties' ongoing disputes.

26.   Plaintiffs' counsel informed OneBeacon's counsel that Plaintiffs were very concerned that OneBeacon would contend that Plaintiffs' cashing of the checks was a waiver of Plaintiffs' rights, because [Plaintiffs] were disputing the amount of the checks and the manner in which the profit share had been calculated.

27.   Some time prior to November 14, 2008, OneBeacon's counsel proposed to Plaintiffs' counsel terms under which OneBeacon would make and Plaintiffs would accept the 2008 Profit Consideration payments.

28.   On November 14, 2008, Plaintiffs' counsel emailed OneBeacon's counsel, stating:

> I was able to catch up with Michelle Tilton and discuss your proposal on payment.  As I had mentioned earlier, we are comfortable with an initial payment from OneBeacon but with the clear understanding that our clients are _not_ waiving any rights to dispute the method for calculating the payment and our clients are also _not_ waiving their rights under the various agreements related to the OneBeacon acquisition of [First Media Insurance Specialists].[4]

29.   "[I]n connection with [Plaintiffs'] ongoing evaluation of OneBeacon's basis for payment," Plaintiffs' counsel's November 14, 2008 email also proposed the following steps as appropriate:

> 1.   Please let us know what amount OneBeacon intends to pay and provide us with a calculation for such amount under the contract.
> 2.   We will be sending a model prepared by our actuary for [First Media Insurance Specialists'] calculation of the payment under the contract.  This model is based, in part, on information which you earlier provided to us.  There are still questions from our earlier emails for which we would request information but we will seek to provide our proposed model, and any remaining question, all at once.
> 3.   We would suggest that a specified date be agreed for final determination of the basis for the profit share calculation.  I would suggest two weeks from today's date.

---

[4] Defs.' Ex. 440.

4. Our expert would still like the opportunity to contact your actuary to discuss the basis for your calculations. As mentioned previously, we still have additional questions based on the numbers and information you have requested, and feel that this would give us an opportunity to hopefully understand and perhaps clear up the basis for your calculations.[5]

30. Plaintiffs' counsel's email concluded with a request that OneBeacon's counsel "please let me know if you think we need to establish a more formal agreement (perhaps a standstill agreement) in connection with the negotiations to work out final payment calculation issues."[6]

31. That same afternoon, OneBeacon's counsel sent OneBeacon's calculation for the Profit Consideration to Plaintiffs' counsel. This calculation reflected that First Media would receive a Profit Consideration payment in the amount of $212,886, and Worrall and Tilton each would receive payments of $70,962. OneBeacon's counsel's email noted that the payment to Tilton, who was then an employee of OneBeacon, would be made through OneBeacon's payroll system.

32. The following week, on or around November 21, 2008, OneBeacon delivered Profit Consideration checks to First Media and Worrall and issued Tilton's Profit Consideration payment through its payroll system, as disclosed in OneBeacon's counsel's November 14 email.

33. On the deadline for payment, December 2, 2008, however, Plaintiffs' counsel wrote to OneBeacon's counsel:

Our client received the attached check last week from OneBeacon. After further consideration, my clients have requested that we return the check back to OneBeacon. I know we had discussed having OneBeacon deliver this payment to First Media without the waiver of any rights by our clients in relation to the

---

[5] *Id.*

[6] *Id.*

disputed issues on the Asset Purchase Agreement.  However, at this time, we have determined that this is not the appropriate course of action.[7]

34.  Without elucidating the exact reasons for refusing payment, Plaintiffs' counsel also identified three particular issues with the checks.  The first two issues concerned the checks' delivery without any accompanying calculation or clarifying documents. Plaintiffs' counsel criticized that absent these documents Plaintiffs could not conclude that the checks actually represent the Profit Consideration due under the Agreements. Plaintiffs' counsel's third issue indicated that First Media's check should have been issued to "First Media Insurance Specialists, Inc.," not "First Media Insurance."

35.  That same day, before the deadline for the 2008 Profit Consideration payment had passed, OneBeacon's counsel replied to Plaintiffs' counsel's email, stating:

> I do not understand this change in course.  In order to avoid a needless exchange of money, I had specifically and repeatedly requested that OneBeacon not issue payment while we negotiate, *but you insisted that we make the payments without a waiver of rights, to which I agreed.  Why the change?*[8]

36.  OneBeacon's counsel also addressed Plaintiffs' counsel's three concerns regarding the issued checks, specifically referencing the Profit Consideration calculation provided November 14.

37.  At trial, Tilton explained Plaintiffs' decision to reject OneBeacon's payments.  Tilton conceded that OneBeacon proposed payment terms comparable to those stated in Plaintiffs' November 14, 2008 email.  Tilton denied, however, that Plaintiffs intended the November 14, 2008 email to constitute an acceptance of OneBeacon's proposed terms. Instead, she characterized the correspondence as an invitation to obtain clear, written assurances from OneBeacon.  She further explained that when the 2008 Profit

---

[7] Defs.' Ex. 444.

[8] Defs.' Ex. 445 (emphasis added).

Consideration payments arrived without those assurances (without, for example, a cover letter explicitly tendering payment on a without prejudice basis), Plaintiffs felt uncomfortable accepting the 2008 payments.

### The 2009 Profit Consideration Payment

38.  In 2009, OneBeacon again sent Plaintiffs OneBeacon's Profit Consideration calculation, which by the end of that year reflected that OneBeacon had calculated a total payout for 2008 and 2009 of $1,275,614, with $765,368 to First Media and $255,123 apiece to Worrall and Tilton.

39.  OneBeacon's 2009 calculation continued to omit the $801,266 in gross premium attributable to policies written during the 42-month Profit Sharing Period.

40.  The 2009 calculation also again included a separate line-item deduction for "Net ULAE Reserve Increase."

41.  OneBeacon's second Profit Consideration payment to Plaintiffs was due and owing on December 2, 2009.

42.  On December 23, 2009, three weeks after the due date, OneBeacon issued payments to Plaintiffs reflecting its 2009 calculations.  OneBeacon issued a check to First Media for $765,369, a check to Worrall for $255,123, and initiated a payroll deposit to Tilton for $255,123.

43.  On January 18, 2010, Plaintiffs' counsel sent OneBeacon's counsel a letter, "confirm[ing] that our understanding is that our clients have agreed to continue to disagree as to the propriety of the profit consideration calculation and that the cashing of the checks will not prejudice either of [the parties'] positions," but stating that his clients "want to be assured that their negotiation of the checks will not be construed or otherwise operate as an accord

and satisfaction."[9]

44. On January 27, 2010, at which point Plaintiffs still had not cashed the checks, OneBeacon's counsel responded to Plaintiff's counsel's January 18, 2010 letter, stating:

> OneBeacon is not willing to agree to the cashing of the checks by your clients on a without prejudice basis. While we understand your clients may seek to reserve their rights (to the extent any exist) if they cash the checks, OneBeacon is not willing to waive any of its rights (to the extent any exist) with respect to the cashing of the checks.[10]

45. Because OneBeacon made clear that Plaintiffs would waive their right to contest the payment amounts by cashing their checks or accepting payment, First Media and Worrall did not cash the 2009 checks, and Tilton had the proposed payroll payment reversed.

### The Lawsuit And 2010 Profit Consideration Payment

46. Plaintiffs continued to dispute the amounts due under the Agreements, and in September 2010, Plaintiffs filed this action.

47. OneBeacon terminated Worrall and Tilton in December 2010. At this time, other than the initial $850,000 sum (representing the Asset Consideration and Cash Advance) paid at closing, Worrall and Tilton had received no money in connection with the sale of First Media to OneBeacon. Tilton remained bound by her Non-Compete Agreement and was not able to take other employment in her field.

48. OneBeacon's third Profit Consideration calculation and any resulting payments became due and owing to Plaintiffs on December 2, 2010.

49. On December 29, 2010, OneBeacon provided Plaintiffs with their 2010 Profit Consideration calculation, showing $2,622,254 owing to Plaintiffs in connection with the 2010 Profit calculation.

---

[9] Pls.' Ex. 17.

[10] Pls.' Ex. 18.

50.   OneBeacon's 2010 calculation included, for the first time, $41,415,513 of gross written premium attributable to polices written during the 42-month Profit Sharing Period.  This was an increase of $801,266 from OneBeacon's 2008 and 2009 calculations.

51.   The 2010 calculation also again included a separate line item for "Net ULAE Reserve Increase."  The 2010 ULAE Reserve amount was slightly higher than previous years, presumably in connection with the increase in gross written premium beginning with the 2010 calculation.

52.   Anticipating that Plaintiffs would seek the same assurances from OneBeacon as requested in the early 2010 correspondence between counsel, OneBeacon's counsel advised Plaintiffs:

> In the event you plan to again seek OneBeacon's consent to . . . redemption of any payment of the Profit Consideration on a without prejudice basis, please be aware that our position on this issue remains unchanged.  OneBeacon is not willing to allow your clients to redeem the payments on a without prejudice basis.  While we understand your clients may seek to reserve their rights (to the extent any exist) if they redeem the payments, OneBeacon is not willing to waive any of its rights (to the extent any exist) with respect to the redemption of payments.[11]

53.   OneBeacon never issued a 2010 Profit Consideration payment to Plaintiffs.

54.   Plaintiffs concede that they were not entitled to any Profit Consideration payments after 2010.  Although Plaintiffs complained at trial that OneBeacon provided either late or no calculations and payment in 2011, 2012, and 2013, the parties agree that the amount of OneBeacon's calculations did not increase in any subsequent year after 2010, and so the Court finds that Plaintiffs sustained no damage by OneBeacon's failure to provide such calculations or tender payment.

---

[11] Pls.' Exs. 20 & 21.  The language of the December 30, 2011 letter varies slightly but uses identical language confirming OneBeacon's unwillingness "to allow [Plaintiffs] to redeem the payments on a without prejudice basis."  Pls.' Ex. 21.

*Summary Judgment, 2014 Payments, And Trial*

55. On August 25, 2014, shortly after oral argument on summary judgment in this action, OneBeacon issued payments to Plaintiffs, including a check to First Media for $1,573,352.40, a check to Worrall for $524,450.80, and a check to Tilton for $524,450.80.

56. OneBeacon's August 25, 2014 payments to Plaintiffs totaled $2,622,254. This is the exact amount that OneBeacon calculated was owed to Plaintiffs in OneBeacon's 2010 Profit consideration calculation.

57. In a letter accompanying OneBeacon's August 2014 checks, OneBeacon specifically informed Plaintiffs that the 2014 payments were "tendered on a 'without prejudice' basis."[12]  For this reason, Plaintiffs cashed the checks despite their continued objections to the amounts of the Profit Consideration payments.

58. Other than OneBeacon's payments at closing to First Media, the 2014 Profit Consideration payments were the first use Plaintiffs had of any money in connection with the sale of their business.

59. Plaintiffs' lack of access to the sums connected to the sale of First Media's assets to OneBeacon caused Plaintiffs financial hardship.  For example, Tilton remained bound by her non-compete after being terminated, so she was unable to find employment within the area of her expertise, despite not having received any compensation under that agreement. That, coupled with the lack of access to money from the sale of her business, forced Tilton to rely on savings and other resources to support herself and her two children.  In addition, this litigation has been extremely expensive for Plaintiffs to pursue and was necessary for Plaintiffs to recover even the amounts that OneBeacon concedes it owed.

---

[12] Pls.' Ex. 25.

60. The Court ruled on the parties' summary judgment motions on August 29, 2014. The Court held that Plaintiffs' "main contention as to how Defendants allegedly breached the contract" (IBNR) was "implausible," and granted OneBeacon summary judgment on that claim, as well as on all of Plaintiffs' then-remaining tort claims and all claims against the individually-named defendants.

61. The Court also ruled that OneBeacon breached the Agreements by failing to properly tender certain Profit Consideration payments.

62. Ultimately, the only issues remaining for trial were (1) whether two items of General Expense—(a) reserves for unallocated loss adjustment expenses ("ULAE") and (b) certain sign-on bonuses paid to employees—were properly included in the Profit calculation and (2) what, if any, prejudgment interest should be awarded to Plaintiffs as compensatory damages for any breach by OneBeacon.

63. The case was tried to the Court on February 3 and 4, 2015. After Plaintiffs completed their presentation of the evidence, OneBeacon moved for judgment of dismissal. The Court granted OneBeacon's motion on the issue of employee sign-on bonuses as expenses in calculating Profit, but denied OneBeacon's motion on the issues of ULAE Reserves and prejudgment interest.

## II.    Conclusions of Law

64. The Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy is greater than $75,000.

65. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

66.   A federal court sitting in diversity will apply the substantive law of the forum state.[13]   The parties contracted to the application of Kansas law, and do not dispute that Kansas law applies.

## A.  OneBeacon's (Non)Compliance With The Agreements

67.   Under Kansas law, a plaintiff bears the burden to prove all elements of its breach of contract claim.[14]

68.   To establish a breach of contract under Kansas law, Plaintiffs must prove: (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) Plaintiffs' performance or willingness to perform in compliance with the contract; (4) OneBeacon's breach of the contract; and (5) damages to Plaintiffs caused by the breach.[15]   The primary rule for interpreting written contracts is to ascertain the parties' intent.[16]

69.   Here, the parties do not dispute the existence of a contract supported by sufficient consideration or Plaintiffs' performance of their obligations thereunder.   Thus, the issues presented for determination by this Court are whether OneBeacon breached its obligations under the Agreements and, if so, the damages to which Plaintiffs are entitled.

### 1.  OneBeacon Breached The Agreements As Set Out In The Court's Summary Judgment Order

70.   Plaintiffs' breach of contract claim seeks damages for OneBeacon's alleged failure

---

[13] *Cook v. Atchison, Topeka & Santa Fe Ry. Co.,* 816 F. Supp. 667, 669 (D. Kan. 1993) (citing *Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990)).

[14] *Louisburg Bldg. & Dev. Co. v. Albright*, 45 Kan. App. 2d 618, 638, 252 P.3d 597, 612 (2011) ("The complaining party is burdened with showing that breach and damage occurred, and the party must provide a reasonable basis for computing that damage").

[15] *See Navair, Inc. v. IFR Americas, Inc.*, 519 F.3d 1131, 1137 (10th Cir. 2008); *see also Commercial Credit Corp. v. Harris*, 212 Kan. 310, 313, 510 P.2d 1322, 1325 (1973).

[16] *Stechschulte v. Jennings*, 297 Kan. 2, 15, 298 P.3d 1083, 1093 (2013).

to pay the agreed-upon purchase price and non-compete considerations under the Agreements. Specifically, Plaintiffs claimed that OneBeacon breached the Agreements by (1) including Incurred But Not Reported ("IBNR") loss reserves as "booked Losses" in its Profit calculations; (2) including losses that occurred outside the Profit Share Period in its Profit calculations; (3) using incorrect gross written premium amounts in its 2008 and 2009 Profit calculations; (4) failing to tender non-conditional payments in 2008 and 2009; (5) failing to provide or perform timely Profit Consideration calculations in 2009, 2010, 2011, 2012, and 2013; (6) including employee sign-on bonuses as "general expenses" in its Profit calculations; and (7) including ULAE Reserves in its Profit calculations.

71. At summary judgment, the Court found that Plaintiffs failed to satisfy the elements for breach of contract as to the issues of IBNR and losses occurring outside the Profit Sharing Period and that OneBeacon breached the Agreements by (1) failing to use the correct gross written premium number when calculating the amounts of Plaintiffs' 2008 and 2009 Profit Consideration; (2) failing to tender non-conditional payments to Plaintiffs in 2008 and 2009; and (3) failing to provide or perform timely Profit Consideration calculations from 2009 through 2013.

72. And at the close of Plaintiffs' case at trial, the Court granted OneBeacon's motion for a judgment as a matter of law as to Plaintiffs' sign-on bonuses claim.

73. Having reviewed the evidence at trial, the Court affirms its rulings at summary judgment regarding IBNR, losses occurring outside the Profit Sharing Period, and the failure to use the correct gross written premium number in 2008 and 2009. The Court also affirms its prior ruling of breach by failing to make payments to Plaintiffs for the 2008 and 2009

Profit Considerations, though as will be discussed further *infra* the Plaintiffs are not without fault with respect to the 2008 payments.  Finally, the Court affirms its ruling regarding breach for failing to provide Profit Consideration calculations from 2009 through 2013, but notes that such failure for the years 2011, 2012, and 2013, did not damage Plaintiffs.  The Courts order of judgment at trial regarding the employee sign-on bonuses continues to stand.

74.   Given these rulings, the only unresolved issues as to Plaintiffs' breach of contract claims are whether OneBeacon breached the Agreements by including deductions for ULAE Reserves as a general expense when calculating Profit for purposes of the Profit Considerations and whether the Court should award Plaintiffs prejudgment interest.

### 2. OneBeacon Did Not Breach The Agreements By Including ULAE Reserves As A "General Expense" In Its Profit Consideration Calculations

75.   The Agreements required OneBeacon to calculate Plaintiffs' Profit Consideration and any resulting payment amounts using the Profit formula provided in the APA.

76.   The parties' agreed-to definition of "Profit" in the APA provides as follows:

> "Profit" means the excess of (A) total media liability insurance premiums written (whether or not fully earned) by Purchaser-affiliated insurance companies during the forty-two (42) month period from the Closing Date (the "Profit Sharing Period"), over (B) the sum of booked Losses, allocated loss adjustment expense ("ALAE") *and general expenses during such forty-two month period, all on a GAAP basis* (except as otherwise expressly permitted by this Agreement). *General expense includes* all the direct costs associated with operating the Fairway, Kansas office (including personnel, occupancy and related costs), all policy acquisition costs, insurer-paid premium taxes, *provision for unallocated loss adjustment expense ("ULAE"),* and an override for corporate overhead equal to one and one half percent (1.5%) of premiums (the "Corporate Overhead Charge").[17]

---

[17] Pls.' Ex. 1, at § 2(a)(ii) (emphasis added).

77. Under Kansas law, construction of a written contract is a matter of law for the Court.[18] "The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the contract language without applying rules of construction."[19] A court's interpretation of contractual language must be determined based on "the plain, general, and common meaning of terms used."[20] If a contract is unambiguous, the Court must enforce that contract and may not rewrite it.[21]

78. In this case, the parties correctly agree that the APA's definition of Profit requires general expenses, which expressly include "provision of ULAE," to be treated on a GAAP basis. Under the APA, the GAAP governs the "provision for ULAE." While the phrase "provision for ULAE" appears after the phrase "all on a GAAP basis" in the APA, "provision for ULAE" is part of the definition of "general expenses," to which GAAP inarguably applies. Since the uncontroverted evidence was that ULAE, both as calculated by OneBeacon generally and as required by GAAP, includes both ULAE Incurred and ULAE Reserves, the plain language of the APA can only reasonably be construed to permit the inclusion of both elements of ULAE: ULAE Incurred and ULAE Reserves.

79. The APA makes clear that ULAE Reserves must be included by its specification that "*provision for* ULAE" be included. If the Court were to interpret this phrase to mean that only the ULAE Incurred—expenses actually paid by the close of the 42-month period—

---

[18] *Wagnon v. Slawson Exploration Co.*, 255 Kan. 500, 511, 874 P.2d 659, 666 (1994).

[19] *Carrothers Constr. Co. v. City of S. Hutchinson*, 288 Kan. 743, 751, 207 P.3d 231, 239 (2009) (citations omitted).

[20] *Wood River Pipeline Co. v. Willbros Energy Servs. Co.*, 241 Kan. 580, 586, 738 P.2d 866, 871 (1987); *see also Payless Shoesource, Inc. v. Travelers Cos.*, 585 F.3d 1366, 1369 (10th Cir. 2009) (explaining that a court must enforce an unambiguous contract "in its plain, ordinary, and popular sense").

[21] *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 713, 732 P.2d 741, 746 (1987).

could be included, the words "provision for" would be rendered meaningless.  In order to give this entire phrase meaning, as the Court is bound by law to do, it must be interpreted to mean that the ULAE used to calculate Profit is not limited to the expenses actually paid by the end of the 42-month period, but also includes "provision for" the expenses anticipated to be paid on the policies at issue—*i.e.*, ULAE Reserves.  This interpretation is also more consistent with the overall intent of the parties' contractual Profit sharing arrangement, which provides for the parties to share the Profit on the policies written during the 42-month period.  If the Court were to adopt Plaintiffs' interpretation of ULAE, it would essentially mean that all claims-handling expense incurred on policies written on the final day of the period—and the lion's share of expenses on policies written leading up to that time—would be treated as "Profit" for Plaintiffs, even though it is undisputed that it would be an expense for OneBeacon.  The Court previously noted that such a result would be "astonishing" when considering, and rejecting, Plaintiffs' argument that reserves for future claims (IBNR Reserves) cannot be accounted for in the Profit calculation.

80.    Plaintiffs have not met their burden to prove that OneBeacon breached the Agreements by accounting for this reserve in the Profit calculation, and OneBeacon is entitled to judgment on this issue.

**B.  Plaintiffs Are Entitled To Prejudgment Interest**

81.    All claims regarding whether OneBeacon accurately calculated the amount of Profit Consideration due to Plaintiffs have now been resolved.  OneBeacon has prevailed on all issues except including the correct gross premium number in calculating the 2008 and 2009 Profit calculation (that error was corrected in the calculation for 2010), timely payment of the amounts due (OneBeacon made full payment of all amounts owed in 2014, and

pursuant to the preceding conclusions, no additional amounts were due and owing), and timely proffer or preparation of certain Profit Consideration calculations (though any failures by OneBeacon to re-calculate or offer calculations in 2011, 2012, and 2013 did not cause any damage, because no additional Profit Consideration was due after 2010). Thus, the only remaining question for the Court is whether prejudgment interest should be awarded by virtue of any failure to sufficiently tender payment in 2008, 2009, or 2010.

82.   Because Defendants did not pay the amount due Plaintiffs until August 2014, Plaintiffs' remaining damages for these breaches consist of the loss of use of those amounts from the date on which the payments became due and owing until the date on which OneBeacon eventually made payment. The Court finds that the proper redress for this damage is an award of prejudgment interest, as detailed below.

83.   In a diversity action, the law governing compensatory damages claims also governs prejudgment interest.[22]   Therefore, in this action, Kansas law applies to Plaintiffs' prejudgment interest claims.

84.   The Kansas prejudgment interest statute provides:

> Creditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes  due; [and] . . . for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts. . . .[23]

85.   "Interest has been defined as the compensation allowed by law or fixed by the parties for the use, detention, or forbearance of money.  In our society today money is a commodity

---

[22] *See Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc.*, 532 F.3d 1063, 1077 (10th Cir. 2008); *GFSI, Inc. v. J-Loong Trading, Ltd.*, 505 F. Supp. 2d 935, 946 (D. Kan. 2007).

[23] Kan. Stat. Ann. § 16-201 (emphasis added).

with a legitimate price on the market and loss of its use . . . should be compensable."[24]

86.   Prejudgment interest thus compensates the injured party for their inability to use money during the time of unlawful deprivation.[25]

87.   A prejudgment interest award is within this Court's discretion, and "[c]onsiderations of fairness and traditional equitable principles are to guide the exercise of this discretion."[26]

### 1. Plaintiffs' Claims Are Not Liquidated

88.   Under Kansas law, "prejudgment interest is allowed on liquidated claims."[27]

89.   A claim is not liquidated until "both the amount due and the date on which it is due are fixed and certain, or when the same becomes definitely ascertainable by mathematical computation."[28]   In particular, damages are not liquidated before the entry of judgment when the amount of damages in a breach of contract case are "subject to dispute" in the litigation.[29]

---

[24] *Lightcap v. Mobil Oil Corp.*, 221 Kan. 448, 468–69, 562 P.2d 1, 16 (1977) (quoting *Shapiro v. Kan. Pub. Emps. Ret. Sys.*, 216 Kan. 353, 357, 532 P.2d 1081, 1084 (Kan. 1975)).

[25] *Vernon v. Commerce Fin. Corp.*, 32 Kan. App. 2d 506, 511, 85 P.3d 211, 215 (2004) (quoting *Moore v. New Ammest, Inc.*, 6 Kan. App. 2d 461, 472, 630 P.2d 167, 176 (1981)); *see also Varney Bus. Servs., Inc. v. Pottroff*, 275 Kan. 20, 44, 59 P.3d 1003, 1020 (2002) (finding no abuse of discretion in awarding prejudgment interest because the defendant had deprived the plaintiff of use of his money since its due date); *Ireland v. Dodson*, 704 F. Supp. 2d 1128, 1140 (D. Kan. 2010) ("Prejudgment interest 'compensates the injured party "for being deprived of the monetary value of his loss from the time of the loss to the payment of the judgment" ' ").

[26] *GFSI, Inc.*, 505 F. Supp. 2d at 947 (citing *Wichita Fed. Sav. & Loan Ass'n v. Black*, 245 Kan. 523, 544, 781 P.2d 707, 721 (1989)).

[27] *Green Const. Co., v. Kan. Power & Light Co.*, 1 F.3d 1005, 1010 (10th Cir. 1993) (citing *Plains Res., Inc. v. Gable*, 235 Kan. 580, 682 P.2d 653 (1984)).

[28] *Hutton Contracting Co. v. City of Coffeeville*, 487 F.3d 772, 786 (10th Cir. 2007) (quoting *Miller v. Botwin*, 258 Kan. 108, 119, 899 P.2d 1004, 1012 (1995)).

[29] *Id.*; *see also, e.g., Ives v. McGannon*, 37 Kan. App. 2d 108, 119, 149 P.3d 880, 890 (2007) (holding damages were unliquidated where "the parties came to court with divergent numbers regarding damages"); *Audiotext Commc's Network, Inc. v. U.S. Telecom, Inc.*, No. 97-3050, 156 F.3d 1243, at *11 (10th Cir. Aug. 6, 1998) (thinking it "obvious the damages were not liquidated" where "[t]he amount of damages was the subject of extensive trial testimony and involved complex statistical procedures and aggregations, some of which were hotly disputed"); *Kan. Tpk. Auth. v. Morgan Guar. Trust Co. of N.Y.*, 751 F. Supp. 936, 942 (D. Kan. 1990) (denying prejudgment interest because the amount due under the parties' contract was "the focus of this dispute," thus making "the damages in this action . . . unliquidated").

90.    Plaintiffs cannot distinguish, as they attempt to do, the circumstances here from *Boardwalk Apartments, L.C. v. State Auto Property & Casualty Insurance Co.*[30]  There, defendant insured but failed to pay plaintiff under a commercial property insurance policy.   When asked to set aside its summary judgment determination that plaintiff's claims for the unpaid amounts under the insurance contract were unliquidated, the court refused.   The court found it "impossible to know with any certainty the amount of . . . damages until the jury heard . . . reviewed . . . and drew conclusions from" the parties' conflicting evidence.[31]  The court also restated its original justification for denying prejudgment interest:

> As illustrated by the sheer amount of issues the Court was called upon to resolve on the [breach of insurance contract] claim in this action, the amount of damages is hotly disputed.  The parties dispute . . . the method of calculation, and several specific items involved in the calculation.  They each rely on different experts and witnesses in support of their calculation.  Given the uncertainty of the damages amount in this case, the Court declines to find that [the plaintiff] is entitled to prejudgment interest under Kansas law on the basis that it is a liquidated claim.[32]

As in *Boardwalk*, the parties here have vigorously litigated the amount owing under an existing contract.   The parties have agreed that OneBeacon owed Plaintiffs payments at particular dates under the Agreements.   But since the first Profit Consideration sum became due in 2008, they have consistently disagreed as to the proper amount of those payments.   Specifically, they have hotly disputed the accuracy of certain included expenses (gross written premium amounts) and the propriety of including specific items (IBNR losses, ULAE reserves, sign-on bonuses, etc.) in the Profit Consideration calculations.   It is disingenuous, therefore, for Plaintiffs to claim that *Boardwalk* is inapposite because the parties agree over the "elements of the 'Profit' formula under the APA."   The parties may

---

[30] 2015 WL 197308 (D. Kan. Jan. 14, 2015).

[31] *Id.* at *23.

[32] *Id.* at *22.

have agreed that, simplified, the "Profit" formula amounted to: [total premiums written] – ["booked Losses" + "allocated loss adjustment expense" + "general expenses"], all during the 42-month Profit Sharing period.  But never have they agreed as to the particular items that constitute "booked Losses" and "general expenses."  And this Court concludes that it was impossible to definitively ascertain the Profit Consideration owing until this Court heard, reviewed, and interpreted the parties conflicting evidence.  Accordingly, the Profit Consideration at issue here is unliquidated.

91.    The fact that the APA defines the method for calculating "Profit" does not change this conclusion.  The amount of Profit Consideration may have been determinable once the Court interpreted the APA.  But the payment amounts were not definitely ascertainable before the Court's ruling.  As just noted, the parties agreed that the APA provided a formula for calculating "Profit."  But they disagreed as to what items the formula actually accounted for.  And their disagreement continued even beyond OneBeacon's August 2014 payment to Plaintiffs.  Because the parties sharply contested the formula inputs and, by their inclusion or exclusion, the final sum owing, the amount of Profit Consideration owed was unliquidated.[33]

92.    Likewise, Plaintiffs argue in error that their claims are partially liquidated as to the lesser Profit Consideration amount calculated and eventually paid in 2014 by OneBeacon.  It is not sufficient to say "that at a minimum, *some* [amount under the contract] was undisputedly due to [plaintiffs] (and therefore liquidated)."[34]   OneBeacon's ability to

---

[33] *Ives*, 37 Kan. App. 2d at 119, 149 P.3d at 890 (holding that damages in contract dispute were unliquidated where "the parties came to court with divergent numbers regarding damages"); *Kan. Tpk. Auth.*, 751 F. Supp. at 942 (concluding that the amount due under an indemnification provision of a contract was unliquidated because "the parties came to court with divergent numbers regarding damages").

[34] *Hutton Contracting Co.*, 487 F.3d at 786.

calculate *an* amount due under the Agreements does not alter the fact that the parties disagreed on *the* amount due.  The parties asserted different calculations and, accordingly, different amounts due.  Such evidence confirms that the Profit Consideration payments were not liquidated.

93.    Because damages here are unliquidated, a prejudgment interest award is unavailable under the general rule of Kansas law.[35]

### 2. K.S.A. § 16-201 And Equity Favor A Partial Award Of Prejudgment Interest

94.    A court may yet award interest on an unliquidated claim if authorized by statute or equity.

95.    K.S.A. § 16-201 specifically provides that "creditors shall be allowed to receive interest . . . for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts."[36]

96.    In *Lippert v. Angle*,[37] the Kansas Supreme Court applied K.S.A. § 16-201 to justify the trial court's award of prejudgment interest.  *Lippert* concerned a suit for gas royalties owed under a lease agreement.  The defendant-lessee constructed a helium production plant on the leased property.  In connection with that project, the defendant asked his royalty owners to sign an unusual division order agreement that provided for royalty payments at a firm rate rather than the original lease rate (a proportion of the gas' market value at the well).  When certain lessors (plaintiffs) refused to sign the agreement, the defendant withheld their royalty payments.  The defendant refused to tender payment, even on the amounts admittedly due under the original lease, until he received signed

---

[35] *See Fid. & Deposit Co. of Md. v. Hartford Cas. Ins. Co.*, 216 F. Supp. 2d 1240, 1246 (D. Kan. 2002) (quotations omitted) ("[T]he general rule [under Kansas law] is 'that an unliquidated claim for damages does not draw interest until it becomes liquidated—usually by judgment.' ").

[36] Kan. Stat. Ann. § 16-201.

[37] 211 Kan. 695, 508 P.2d 920 (1973).

division orders.  The trial court awarded prejudgment interest on plaintiffs' claims for the

unpaid royalties.  The Kansas Supreme Court affirmed, noting:

> All that [defendant] ever did in the way of accounting or settlement over a long
> period of time after product had begun was to tender the [division order
> agreement] on a take-it-or-leave-it basis.  He thus insisted upon that which
> amounted to a modification of his leases.  Although he was under a positive duty
> under those leases to pay royalty during the period of production he made no
> tender to [plaintiffs] under them until long after this lawsuit had been filed.  This
> belated tender including nothing in the way of interest for the long withholding of
> [plaintiffs'] money and was ineffectual to terminate liability for interest.[38]

The Kansas Supreme Court since has interpreted *Lippert* to justify prejudgment interest

awards "not on the basis that the claim was liquidated but because of the [defendant's]

'unreasonable and vexatious delay of payment' under K.S.A. § 16-201."[39]

97.   Also, courts generally "have been moving away from the traditional distinction between

liquidated and unliquidated claims" because "injured parties suffer losses which may not be

fully compensated if their recovery is confined to the amount recoverable as of the time of

breach and no additional amount is added for the delay in obtaining the damages."[40]

98.   Consistent with this reasoning, Kansas law recognizes a qualification to the general rule

that prejudgment interest is unavailable on unliquidated claims.[41]   A court may award

prejudgment interest on an unliquidated claim when, in its discretion, the court determines

that "there are unusual circumstances making it equitable to allow for such an award."[42]

---

[38] *Id.* at 704, 508 P.2d at 927.

[39] *Lightcap*, 221 Kan. at 467, 562 P.2d at 15; *see also Audiotext Commc'ns Network, Inc.*, 156 F.3d at *11 ("Guided by considerations of fairness and equity, such an award is intended to fully compensate a party injured through vexatious withholding of monies owed."); *Continental Ins. Co. v. Wichita Fed. Sav. & Loan Ass'n*, 1989 WL 18815, at *7–8 (D. Kan. Feb. 13, 1989) (citation omitted) (applying *Lippert* to make prejudgment interest award where defendant inequitably denied payment to plaintiff).

[40] *Roberts v. Chesapeake Operating, Inc.*, 2010 WL 745002, at *3 (D. Kan. Feb. 26, 2010).

[41] *Fid. & Deposit Co. of Md.*, 216 F. Supp. 2d at 1244–45 (citing *Lightcap*, 221 Kan. at 467, 562 P.2d at 15).

[42] *Id.* at 1245.

One such unusual circumstance is "when the defendant has had use of the money, the plaintiff has been deprived of the use of the money, and the order is necessary to award full compensation."[43]  The "key fact," however, typically is "that the defendant had knowledge that it possessed money that rightfully belonged to another."[44]

99.  Ultimately, the award of prejudgment interest is a matter which lies within the sound discretion of this Court.[45]

### a. OneBeacon's 2008 Tender

100.  A court acts "well within its discretion in denying prejudgment interest" where the plaintiff "itself was partially at fault" for delaying its own recovery.[46]

101.  OneBeacon did not withhold payment from Plaintiffs in 2008.  OneBeacon originally agreed in 2008 to pay Plaintiffs in accordance with the non-waiver terms of payment that Plaintiffs demanded.[47]  Following that agreement, OneBeacon timely tendered payment. But Plaintiffs refused to accept payment.  Plaintiffs did not explain their precise objections to OneBeacon's tender, nor did Plaintiffs offer alternative terms under which they would accept payment.  Accordingly, Plaintiffs themselves were partially at fault in causing the ultimate delay in payment.[48]

---

[43] *Id.* (quoting *Farmers State Bank v. Prod. Credit Assoc. of St. Cloud*, 243 Kan. 87, 102, 755 P.2d 518, 528 (Kan. 1988)).

[44] *Id.*

[45] *See, e.g.*, *Leeper v. Schroer, Rice, Bryan & Lykins, P.A.*, 241 Kan. 241, 247, 736 P.2d 882, 887 (1987) ("Clearly, the allowance or disallowance of prejudgment interest herein was a matter of judicial discretion.").

[46] *Hutton Contracting Co.*, 487 F.3d at 787.

[47] Titlon's concession and the parties' exchanges, as described in paragraphs 25–37, indicate that the parties had an agreement as to the terms under which Plaintiffs would accept payment, including that Plaintiffs would not be required to waive their rights by accepting payment; but despite this agreement, Plaintiffs rejected the 2008 payments tendered.

[48] *See Hutton Contracting Co.*, 487 F.3d at 787 ("the district court acted well within its discretion in denying prejudgment interest, particularly because Hutton was itself partially at fault and the City's presuit letter of August 5, 2002, offered Hutton more than what it later obtained through its judgment").

102. Because Plaintiffs, and not solely OneBeacon, unreasonably caused delays in their receipt of payments under the Agreements by refusing OneBeacon's 2008 tender, the Court determines that awarding Plaintiffs prejudgment interest on the 2008 Profit Consideration payment from the date of OneBeacon's 2008 tender would be inequitable.

### b. OneBeacon's 2009 And 2010 Tenders

103. The Court is unable to conclude, however, that OneBeacon acted reasonably in either 2009 or 2010 by refusing to tender payment that Plaintiffs could use "on a without prejudice basis."

104. With regard to both the 2009 and 2010 payments, OneBeacon breached the Agreements.[49] In 2009, OneBeacon used an incorrect premium figure to calculate the amount due and untimely tendered payment. In 2010, OneBeacon failed to perform a timely Profit Consideration calculation and failed to proffer any payment to Plaintiffs.

105. More importantly, OneBeacon offered the 2009 and 2010 payments on a take-it-or-leave-it basis. As required by the Agreements, Plaintiffs transferred First Media and its assets to OneBeacon. In exchange, OneBeacon proposed payments that Plaintiffs believed to be erroneous. To clarify, the Agreements did not require Plaintiffs to accept arguably erroneous Profit Consideration payments; but they did require OneBeacon unconditionally to pay Plaintiffs. Plaintiffs sought assurances that they could accept OneBeacon's payments without their acceptance operating as an accord and satisfaction. In 2009 and 2010, OneBeacon acknowledged that Plaintiffs' "[sought] to reserve their rights" but

---

[49] The Court does not award damages specific to 2011, 2012, and 2013. Although OneBeacon provided no calculations in 2012 and 2013 and no payments in 2011, 2012, and 2013, the parties agree that the amount of OneBeacon's calculations did not increase in any subsequent year after 2010. In other words, Plaintiffs concede that they were not entitled to any payments beyond the amount tendered in 2010. Accordingly, the Court finds that Plaintiffs sustained no damage for the 2011, 2012, and 2013 breaches.

nonetheless refused Plaintiffs' request.[50]  Instead, OneBeacon put it to Plaintiffs:  accept the tendered amounts and risk waiving your right to contest our payment calculations *or* preserve your right to challenge our calculations and forfeit your right to immediate compensation.   Thus dealing like the lessee in *Lippert*, OneBeacon withheld amounts admittedly due to Plaintiffs because Plaintiffs sought to preserve their rights.[51] OneBeacon's decision to put Plaintiffs to the dilemma of (dis)claiming their rights caused unreasonable and vexatious delay in payment.  Accordingly, K.S.A. § 16-201 authorizes an award of prejudgment interest.

106.     Alternatively, equitable principles justify an award of prejudgment interest. Importantly, OneBeacon unreasonably deprived Plaintiffs of the use of money with knowledge that the money rightfully belonged to Plaintiffs.  OneBeacon, not Plaintiffs, had use of the amounts owed.  Plaintiffs did not have actual use of any of the post-closing Profit Consideration sums until, in August 2014, OneBeacon tendered payment explicitly on a without prejudice basis.  Even to secure this payment, Plaintiffs had to endure extensive litigation and financial hardship.  OneBeacon's withholding of payments appears even more unreasonable considering the non-compete obligations that limited Worrall and Tilton's employment opportunities.  It is quite commonplace that parties to a contract will dispute payments due thereunder.  OneBeacon's repeated decision to condition those payments on waiver of Plaintiffs' rights, however, constitutes unusual circumstances. Considerations of fairness and equity thus convince this Court that an award prejudgment

---

[50] Pls.' Exs. 18, 20, & 21.

[51] *See also Continental Ins. Co.*, 1989 WL 18815, at *8 (awarding prejudgment interest under *Lippert* where defendant paid no monies, including amounts that were admittedly owed, when due).

interest is necessary make Plaintiffs whole under these unusual circumstances.[52]

107. Like the initial decision to award prejudgment interest, the period and rate of a prejudgment interest award are discretionary matters.[53] OneBeacon's inequitable conduct began in 2009 and continued until its unconditional 2014 tender. Plaintiffs' damages, however, are limited to the 2009 and 2010 payments. So interest will be calculated from the date each of these two payments became due until the date OneBeacon ultimately issued unconditional payment of those amounts to Plaintiffs. The Court considers a flat 5% rate of interest appropriate. The Court rejects the statutory 10% rate of interest as excessive considering the significant disparity between the statutory and market-based interest rates.[54] The Court thus intends to award prejudgment interest as follows:

**2009 Profit Consideration Payment**: 5% interest on the payment amount due December 2, 2009, including the sum unpaid from 2008,[55] for the period beginning Dec 2, 2009, and ending August 25, 2014;

---

[52] *See Varney Bus. Servs., Inc.*, 275 Kan. at 44, 59 P.3d at 1020 (affirming award of prejudgment interest because the defendant withheld and "had use," not *used*, the fees collected and owing to plaintiff under their agreement); *Roberts*, 2010 WL 745002, at *3 (quotation omitted) ("These exceptions rise from the equitable concern of 'mak[ing] the plaintiff whole.' ").

[53] *See, e.g.*, *Fid. & Deposit Co. of Md.*, 216 F. Supp. 2d at 1243 (quoting *Mitchelson v. Travelers Ins. Co.*, 229 Kan. 567, 573, 629 P.2d 143, 148 (1981)) ("When prejudgment interest should commence is a matter to be determined by the trial court in the exercise of its sound discretion, upon consideration of all the attendant facts and equities."); *Baty v. Willamette Indus., Inc.*, 985 F. Supp. 987, 999 (D. Kan. 1997) (applying 5% interest rate, rather than K.S.A. § 16-201's 10% rate, because award of full statutory rate would overcompensate plaintiff); *McDaniel v. Wright*, 2000 Kan. App. Unpub. LEXIS 821, at *6–7 (Mar. 24, 2000) ("We do not read K.S.A. 16-201 to require that a district court must always award the full statutory rate of interest regardless of the equities of the case.").

[54] The Court reviewed OneBeacon's proposal to adopt a 4.2% interest rate. OneBeacon's proposed rate attempts to mirror the average annual yields on low-risk investments (bonds) for the time period. The Court appreciates the concern for identifying a rate of return that neither creates an inequitable windfall for Plaintiffs nor improperly penalizes OneBeacon. But the Court is satisfied that a 5% rate of interest appropriately compensates Plaintiffs for their inability to use the sums owed.

[55] As discussed, Plaintiffs refused to accept a valid tender when initially made in 2008. OneBeacon argues that had Plaintiffs accepted the 2008 tender the amount would not have been due in later years and thus should be excluded from any prejudgment interest calculations. The Court disagrees. Plaintiffs' unreasonable conduct in 2008 is adequately addressed by denying Plaintiffs interest for the December 2, 2008 to December 2, 2009 time period. OneBeacon's unreasonable conduct in the following years (including repeatedly failing to pay the 2008 sum) independently supports the Courts award.

**2010 Profit Consideration Payment**: 5% interest on the payment amount due December 2, 2010, calculated as though OneBeacon had properly tendered and Plaintiffs had accepted the 2009 Profit Consideration payment, for the period beginning December 2, 2010, and ending August 25, 2014.

108.   The Court orders the parties, no later than May 18, 2015, to submit an agreed accounting of the amount of prejudgment interest that is due under the Court's preceding directions.  The Court proposes to enter final judgment following the parties' agreed accounting submission.

**IT IS THEREFORE ORDERED** that on or before May 18, 2015, the parties submit an agreed accounting of the prejudgment interest which is due under this Order;

**IT IS FURTHER ORDERED** that upon receipt and approval of that accounting, the Court will direct the Clerk to enter judgment in favor of OneBeacon on Plaintiffs' remaining breach of contract claims and against OneBeacon, as explained in paragraphs 71 and 73 of this Order, in an amount equal to the parties' agreed accounting.

**IT IS SO ORDERED.**

Dated this 4th day of May, 2015.


*Eric F. Melgren*
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE